# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EARL HALL** | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **DETECTIVE TIMOTHY HARTMAN,** | : | |
| **DETECTIVE JOSEPH CREMEN** | : | **NO. 20-3235** |

## MEMORANDUM OPINION

**Savage, J.**                                                                          **July 1, 2021**

After plaintiff Earl Hall was found not guilty for crimes in connection with the non-fatal shooting of Terrell Barnes, he brought claims for malicious prosecution under 42 U.S.C. § 1983 and Pennsylvania law.[1] He contends that the defendants, acting with malice, lacked probable cause to prosecute him.

The defendants, the two detectives who investigated the shooting and referred the case to the District Attorney, have moved for summary judgment. They argue Hall cannot prove an essential element of his malicious prosecution claim – lack of probable cause. They contend that the undisputed facts establish that the prosecution was supported by probable cause.

After reviewing the summary judgment record, we conclude that a reasonable jury could not find there was a lack of probable cause. Furthermore, Hall has produced no evidence that the grand jury indictment was procured by fraud, perjury, or other corrupt means. Thus, because the undisputed evidence shows that Hall's prosecution was instituted with probable cause, we shall grant the motion for summary judgment.

---

[1] Hall concedes that his claims for false arrest and false imprisonment are time-barred. *See* Pl.'s Opp. to Defs.' Mot. for Summ. J. at 1 (ECF No. 21).

**Background**

On April 20, 2017, around 11:00 pm, Terrell Barnes was shot at 1451 Conlyn Street in northwest Philadelphia.[2] Responding to reports of multiple gunshots near 15th and Conlyn Street, police observed a minivan and sedan speeding the wrong way down Conlyn.[3] They lost sight of the vehicles for a short time.[4] When the officers saw them again, the vehicles were stopped.[5] Once spotted, the vehicles took off in different directions.[6] The officers radioed the sedan's information and pursued the minivan.[7]

At 11:06 pm, the minivan crashed.[8] The rear-passenger, Gerald Wright, ran and was quickly apprehended after discarding his cell phone.[9] Police arrested Wright and the driver, his cousin Jametris Price.[10] Other officers stopped the sedan and apprehended the driver, Terrell Faison, and the passenger, Omar Donaldson.[11] The police took them to Northwest Detective Division (NWDD) for questioning.[12]

---

[2] *See* Defs.' Mot. for Summ. J. Ex. C (75-49 Investigation Report).

[3] *Id.* at D1452.

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.* at D1453.

[9] *Id.* at D1452.

[10] *Id.* at D1452, D1465.

[11] *Id.* at D1452.

[12] *Id.*

2

Detectives Hartman and Cremen led the investigation into the shooting.[13] At the crime scene, investigators collected two dozen fired cartridge casings from 9mm and .45 caliber handguns.[14] Another 9mm fired cartridge was found inside the middle row of the minivan.[15] In the grass near where the two vehicles had briefly stopped, police found a 9mm handgun and a .45 handgun.[16] Testing on the outer layer of Wright's clothing revealed gunshot residue.[17]

Early the next morning, Hartman and Cremen interviewed Faison, the driver of the sedan.[18] He implicated Hall in the shooting. He told the detectives that prior to the shooting, he, Donaldson, Wright, and Hall were at Donaldson's mother's house when they "decided they were going to a Chinese restaurant on Broad Street."[19] He and Donaldson followed Hall and Wright, who were picked up by Price in a minivan, because they "were going somewhere else after they ate."[20] When the two vehicles arrived at 15th and Conlyn, Hall and Wright "got out of the minivan and did the shooting" and jumped back into the minivan.[21] Faison said he had "no idea" that they were going to shoot anyone.[22]

---

[13] *Id.*

[14] *Id.*

[15] Defs.' Mot. for Summ. J. Ex. B at 23:7-10 (Hartman Deposition Transcript).

[16] 75-49 Investigation Report at D1452.

[17] Hartman Dep. Tr. at 22:9-15; 94:16-95:21.

[18] *See* Defs.' Mot. for Summ. J. Ex. F (April 21, 2017 Interview of Faison).

[19] Hartman Dep. Tr. at 40:20-41:3.

[20] *Id.* at 41:4-7.

[21] *Id.* at 40:22-41:20.

[22] *Id.*

3

On April 25, Hall was brought into the NWDD for an interview.[23] He offered what Hartman considered a suspiciously detailed alibi for the night of April 20.[24] He claimed that he and his girlfriend attended a rap concert at Club Voltage, near 7th and Callowhill Streets, until 10:45 pm and later went to two hookah bars until 2:00 am.[25] Hartman and Cremen released Hall because they "had some doubts" that he was involved in the shooting.[26] They kept his cellphone.[27]

At the same time, Hall's girlfriend was interviewed by another detective at NWDD.[28] She claimed she was with Hall the whole evening, essentially confirming his alibi.[29] The difference was that she said they went to one hookah bar, not two, arriving around 11 pm and staying until around 1:50 am.[30]

To corroborate Hall's alibi, the detectives obtained video footage from Club Voltage and both hookah bars.[31] The surveillance footage showed Hall and his girlfriend leaving Club Voltage at 9:58 pm, 47 minutes earlier than Hall said he had and 62 minutes earlier than Hall's girlfriend claimed. It also revealed that they did not arrive at the first hookah

---

[23] See id. at 54:2-10.

[24] Id. at 100:20-101:11 ("... [H]e had this mapped out and planned, this was going to be his planned statement, his planned alibi for what happened when the police eventually come to talk to him").

[25] Defs.' Mot. for Summ. J. Ex. H at 09:12:00-09:20:00; Defs.' Mot. for Summ. J. Ex. A at 49:16-50:3 (Cremen Deposition Transcript).

[26] Hartman Dep. Tr. at 104:9-10.

[27] Id. at 101:12-16.

[28] Defs.' Mot. for Summ. J. Ex. J.

[29] Id at 2.

[30] Id. at 2-3.

[31] See Defs.' Mot. for Summ. J. Ex. K.

4

bar at 18th and Cecil B. Moore Avenue until 11:23 pm.[32] At his deposition, Hartman said the footage showed Hall was driving when the couple left Club Voltage, but was the passenger when they arrived at the first hookah bar, leading Hartman to suspect that they had stopped somewhere not mentioned during the interviews.[33]

The detectives interviewed Faison again.[34] When they confronted him with Hall's alibi, he "was adamant" that Hall had been involved and told the detectives that Hall was deceiving them.[35] Recounting the interview at his deposition, Hartman said he "could tell by his demeanor and his emotion that he was terrified about being a rat . . . I believe he was being truthful just by his—the way he was responding."[36]

These inconsistencies led Hartman and Cremen to interview Hall's girlfriend on May 3.[37] During this second interview, she changed her story, saying that she and Hall went from Club Voltage to the first hookah bar, but only stayed for two minutes because it was crowded.[38] She added that they had gone to her godmother's house at 21st and Nedro, approximately eight blocks from the shooting scene.[39] While she went inside to

---

[32] 75-49 Report at D1452.

[33] Hartman Dep. Tr. at 111:7-18.

[34] *Id.* at 104:9-22.

[35] *Id.*

[36] *Id.*

[37] Defs.' Mot. for Summ. J. Ex. M.

[38] *Id.* at 1-2

[39] *Id.*

5

visit for "five to ten minutes," Hall remained in her car.[40] She conceded that he could have used her car while she was inside.[41]

The detectives examined Hall's phone and his call records.[42] A forensic examination of his phone uncovered two deleted messages between him and Wright, the first at 10:24 pm and another at around 11:00 pm, which said "ARD," which Hartman knew as slang for "all right."[43] Call records showed that Hall had placed two calls to his girlfriend that night, both at 10:49 pm, the first call lasting 18 seconds and the second lasting for just under seventeen minutes.[44] Cell tower data from T-Mobile placed these calls near its 910 Church Lane tower, which is approximately two blocks from Hall's girlfriend's godmother's house at 21st and Nedro Street and Donaldson's mother's house at 5755 North Beechwood Street, which are only about six blocks from the shooting scene.[45]

Based on the inconsistencies between his alibi and the cell phone evidence, the detectives asked Hall to return to NWDD on May 11 under the guise of retrieving his cell phone.[46] When he arrived, they arrested him.[47] Hall agreed to be interviewed again. He told the detectives that after briefly stopping at the first hookah bar, he went to a house

---

[40] *Id.* at 1-3

[41] *Id.* at 3.

[42] Defs.' Mot. for Summ. J. Ex. N; Defs.' Mot. for Summ. J. Ex. O (Detective Hartman's Cell Tower Summary for Earl Hall's Phone).

[43] Hartman Dep. Tr. at 101:12-102:17.

[44] *See* Cell Tower Summary at D1154-D1155; *see also* Hartman Dep Tr. at 114:21-116:11.

[45] *Id.*

[46] 75-49 Report at D1453; *see* Defs.' Mot. for Summ. J. Ex. P (May 11, 2017 Video Recorded Interview of Earl Hall).

[47] *See* May 11, 2017 Video Recorded Interview of Earl Hall; 75-49 Report at D1466.

on the 5700 block of Beechwood Street – the same block as the house where Faison said that he, Hall, Wright, and Donaldson had been immediately before the shooting.[48] Then, Hall claimed he went to his girlfriend's godmother's house before returning to the first hookah bar.[49]

The detectives referred the case to the Philadelphia District Attorney's Office. The District Attorney approved charges against Hall for attempted murder, conspiracy, and related charges.[50]

At the grand jury, Cremen testified about Hall's alibi and Hartman presented the evidence from T-Mobile placing Hall near the crime scene at the time of the shooting.[51] Wright, Price, and Hall were indicted on June 2.[52] After a bench trial on April 27, 2018, Hall was found not guilty.[53]

**Standard of Review**

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A). Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[48] Defs.' Mot. for Summ. J. Ex. Q at 5 (Verification from Philadelphia Assistant District Attorney Whitney Golden).

[49] May 11, 2017 Video Recorded Interview of Earl Hall at 11:55:49-11:56:30; 11:59:24-12:01:51.

[50] ADA Golden Verification at 5 (handwritten note next to charges stating "approved by ADA Newtown 5/11/17 at 4:56 PM").

[51] Hartman Dep. Tr. at 113:4-14.

[52] Defs.' Mot. for Summ. J. Ex. R at 4, 6.

[53] *Id.* at 6, 11.

7

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party. FED. R. CIV. P. 56(A). Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which it bears the burden of production. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

**Analysis**

To establish a Fourth Amendment claim of malicious prosecution, a plaintiff must prove that: (1) the defendant initiated a criminal proceeding against him; (2) the criminal proceeding ended in his favor; (3) the proceeding was initiated without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing him to justice; and (5) he suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *Harvard v. Cesnalis,* 973 F.3d 190, 203 (3d Cir. 2020) (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)). To establish a claim of malicious prosecution resulting in a criminal proceeding under Pennsylvania law, a plaintiff need not prove the fifth element, a seizure consistent with the Fourth Amendment. *Kossler v. Crisanti*, 564 F.3d 181, 186 n.2 (3d Cir. 2009) (citing *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 791 (3d Cir. 2000)).

Hall cannot establish the third element, the absence of probable cause to initiate criminal proceedings. The undisputed facts show there was probable cause to prosecute him.

Whether probable cause existed is usually a factual determination for a jury to make. *Dempsey v. Bucknell Univ.,* 834 F.3d 457, 468 (3d Cir. 2016) (citing *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997) and *Groman v. Twp. of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995)). However, when the evidence, viewed in favor of the non-moving party, "reasonably would not support a contrary factual finding," a court may conclude that probable cause existed as a matter of law. *Id*. (quoting *Sherwood*, 113 F.3d at 401); *Merkle*, 211 F.3d at 788-89. In other words, if a reasonable jury could not conclude that there was a lack of probable cause, the defendant is entitled to summary judgment.

Hall argues that the detectives were "objectively unreasonable to think that [he] likely shot Mr. Barnes."[54] Hall focuses on his not guilty verdict and Faison's unreliability based on his lengthy record. But, it was not Faison's word that the detectives relied upon in arresting Hall and referring the case to the District Attorney's office. Instead of relying solely on Faison, the detectives twice confronted Hall and his girlfriend, and checked out the alibi they offered. The detectives found inconsistencies between the original version and the later version of the alibi, and contradictions between the alibi and the incontrovertible surveillance and cell phone evidence. Only then did they credit Faison's claim that Hall was one of the shooters. In the end, it was Hall's own words that led the detectives to arrest him and refer the case to the District Attorney.

---

[54] Pl.'s Opp. at 7.

The detectives found that Hall had been where he said he had been that night. But, he had not been there *when* he claimed he had been. They discovered that he had not been far from the shooting scene and had had ample time to have been there and at the other places during the relevant time period. In other words, the evidence uncovered by the detectives demonstrated that Hall could have participated in the shooting as Faison claimed.

When evaluating a malicious prosecution claim, we examine whether probable cause existed at the time the criminal proceeding was initiated. *See Blenman v. Dover Police Dep't*, 214 F. Supp. 3d 261, 266–67 (D. Del., 2016) (citing *Gallo v. City of Phila.*, 161 F.3d 217, 222 (3d Cir. 1998)). Here, the criminal proceeding began with the grand jury indictment.

A grand jury indictment creates a "presumption of probable cause." *Goodwin v. Conway*, 836 F.3d 321, 329 n.35 (3d. Cir. 2016). It is considered "'prima facie evidence of probable cause.'" *Costino,* 786 F. App'x. 344, 374 (3d Cir. 2019) (quoting *Rose v. Bartle*, 871 F.2d 331, 353 (3d Cir. 1989)). To rebut the presumption, the plaintiff must show that the indictment resulted from "fraud, perjury or other corrupt means." *Rose,* 871 F.2d at 353; *see also Costino,* 786 F. App'x. at 347 (citing *Goodwin,* 836 F.3d at 327) (holding that, unless procured by fraud, perjury, or corruption, a grand jury's indictment "is a complete defense" to a claim of malicious prosecution).

There is no evidence that the indictment was procured through fraud, perjury, or corruption. Instead, Hall argues that the evidence was insufficient to prosecute him, claiming that "it should have been clear to any person of ordinary prudence" that he was not one of the shooters and instead "the individuals who fired the two guns found at the

scene were among the four people who were arrested while fleeing the scene."[55]  The issue is not whether the evidence was sufficient to prosecute him, but whether there was probable cause to initiate criminal proceedings.

The grand jury who reviewed the evidence found probable cause to indict him.  In the absence of any evidence that the indictment was procured by fraud, perjury, or corruption, the indictment establishes probable cause.  There is no evidence to rebut this presumption.

**Conclusion**

Because the undisputed facts establish that Hall's prosecution was instituted with probable cause, he cannot establish a claim of malicious prosecution.  His claims of false arrest and false imprisonment are time-barred.  Thus, we shall grant the defendants' motion for summary judgment.

---

[55] *Id*. at 6.